IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERICA | ) |
| --- | --- |
| v. | ) Case No. 1:17-cr-211 |
| DWAYNE STINSON, | ) Hon. Liam O'Grady |
| *Defendant.* | ) |

## MEMORANDUM OPINION

This memorandum opinion is issued in support of the Court's previous orders on Defendant's Motion to Suppress Statements Obtained in Violation of the Fifth and Fourteenth Amendments and Defendant's Motion for a *Franks* Hearing and to Suppress Evidence Seized from His Home. *See* Dkt. 60; Dkt. 62.

### I. Background

In May 2010, the Homeland Security Investigations ("HSI") office in Dallas, Texas, initiated an investigation into sexual abuse of children in the Philippines. The investigation identified several people in the Dallas area who sent money to individuals in the Philippines as payment for viewing online live sexual abuse of children. The Dallas office identified 40 individuals in the Philippines who received such payments, and obtained payment records related to those individuals. From these records, HSI was able to identify several thousand individuals who had paid money to the Philippine accounts. Among these was Defendant. The Dallas office sent a detailed report regarding Defendant to the Washington, D.C. office of HSI. The report explained that from 2008 to 2010, Defendant made approximately $1,796.50 in payments via

1

Xoom[1] to individuals associated with online sexual abuse of children in the Philippines.

On March 13, 2012, at approximately 8:00 P.M., HSI Special Agent ("SA") K. Eyler, HSI SA C. Moldowan, and Prince William County Detective T. Abdallah visited Defendant's home in Manassas, Virginia. Defendant's wife answered the door, and SA Eyler asked to speak to Defendant. Dkt. 48. Ex. 1 at 2:6-17. When Defendant came to the door, SA Eyler said, "We're doing an investigation and your name came up and I was wondering if we can talk to you about it, maybe you can help us figure this out." *Id.* at 3:4-8. Defendant said, "Okay. Can I ask what it's about? I mean I'm just curious." *Id.* at 3:9-10. SA Eyler responded, "Yeah. It's a child exploitation case." *Id.* at 3:11-12. Defendant said, "Okay. Child exploitation case?" SA Eyler replied, "Yes. It's a little sensitive. I don't know if you wanted your family to hear about it or not." *Id.* at 3:13-16. Defendant then asked if they could go outside. *Id.* at 3:17. The agents accommodated his desire to continue the conversation outside of the hearing of his family, and spoke with Defendant on the front porch of his home. *Id.* at 3:18-22.

SA Eyler explained that Defendant's credit card information had been connected with Xoom. *Id.* at 4:1-10. Defendant acknowledged that the payments were to "get girls in the Philippines that, you know, dance, you know, for you, you know, play like that stuff. You know." *Id.* at 4:11-14. He initially denied that the videos involved sexual exploitation of children, and stated that the individuals were "[r]oughly, you know, from about maybe 20 to, you know, 40s . . . They say they're at least 18 or older." *Id.* at 4:16-18; 5:19-6:3. SA Eyler informed Defendant that the women to whom Defendant had made payments were involved in sexual exploitation of children. *Id.* at 6:4-14. Defendant declined SA Eyler's request to look through his computer. *Id.* at 7:13-19.

---

[1] A money transfer service.

It appeared that Defendant had chosen to conclude the interview, and SA Eyler turned off the audio recording. *Id.* at 9:2. Defendant then reengaged the agents, and the continued conversation was recorded. *See* Dkt. 48, Ex. 2; *see also* Dkt. 56 at 21:1-13. In this portion of the conversation, Defendant stated "I do think some of those girls on there were underage." Dkt. 48, Ex. 2 at 2:2-4. Defendant discussed certain payments he had made on Xoom, and stated that the varying prices were based on "how many girls are there." *Id.* at 3:9-20. Defendant further stated that he viewed "moms and daughters," and that the individuals were "I mean from various ages. You know, from teenage to on up." *Id.* at 4:15-18.

After the interview, Det. Abdallah sought and obtained a search warrant for Defendant's home from a Prince William County magistrate judge. *See* Dkt. 44, Ex. 1. Because Defendant was now aware of the nature of the investigation, and thus had the opportunity and incentive to destroy evidence, the search warrant was executed that same night, at approximately 10:30 P.M. *See* Dkt. 48 at 4. During the execution of the search warrant, Defendant made certain statements to law enforcement. Those statements were also recorded.

On July 24, 2017, Defendant was arrested. *See* Dkt. 8. Defendant was charged with five counts of sexual exploitation of children in violation of 18 U.S.C. § 2251(a). *See* Dkt. 31. By motions filed on January 5, 2018, Defendant sought suppression of the statements he made to law enforcement during the execution of the search warrant, requested a *Franks* hearing as to the affidavit offered in support of the search warrant, and moved to suppress all evidence seized from his home during the search of March 13, 2012.[2] *See* Dkt. 43; Dkt. 44.

## II. Motion to Suppress Statements

The Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To safeguard this constitutional

---

[2] The search carried over into the early hours of March 14, 2012. *See* Dkt. 49 at 7.

3

guarantee, the Supreme Court has required law enforcement to inform individuals who are in custody of their Fifth Amendment rights prior to interrogation. *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

A person is "in custody" for purposes of *Miranda* if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest. *Burket v. Angelone*, 208 F.3d 172, 196 (4th Cir. 2000). The Court must consider whether a reasonable person in the individual's position would have understood his situation as the functional equivalent of a formal arrest. *Id.* To determine whether an individual was in custody, a court must objectively view the totality of the circumstances surrounding the interrogation. *See United States v. Freeman*, 61 F. Supp. 3d 534, 536 (E.D. Va. 2014). Facts relevant to this inquiry include, but are not limited to, the time, place, and purpose of the encounter, the words used by the officers, the officers' tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by the officers, and whether there was physical contact between the officers and the defendant. *Id.* at 536-37 (citing *Hashime*, 734 F.3d at 283).

Defendant asserts that he was in custody and was being interrogated by law enforcement officers when he made certain statements to them during the execution of the search warrant in his home. Specifically, Defendant claims he was in custody because (1) a contingent of at least 13 officers entered Defendant's home to execute the search warrant; (2) many of the officers were in uniform, and armed; (3) the officers controlled Defendant's family members' movements, including by detaining them all in the living room; and, according to Defendant, (4) the officers occasionally pointed guns at Defendant and his family. *See* Dkt. 43 at 3-4. Defendant suggests that he was restricted to the basement bedroom during the course of the interview, and

4

places great importance on the fact that the officers never advised him of his *Miranda* rights or explicitly told him that he was free to leave. *Id.* at 4-5.

The interview at issue, as explained above, was conducted during the execution of the search warrant on March 13, at approximately 10:30 P.M. The encounter began when the agents entered the residence with guns unholstered, in accordance with protocol. *See* Dkt. 56 at 27:16-31:11. The guns were holstered once the scene was secured. *Id.* (explaining that residents of the home stay outside during the security sweep, which takes approximately five minutes). While other officers executed the search warrant, SA Eyler and Det. Abdallah asked Defendant if he would be willing to speak to them again. *Id.* at 34:6-12. He agreed. *Id.* The interview took place in a basement bedroom, away from the noise of the ongoing house search, and away from Defendant's family in accordance with the preference he had expressed during the earlier interview. *See id.* at 34:13-18. The door was shut, but it was not locked or obstructed. *Id.* at 35:24-37:3. SA Eyler confirmed that Defendant had read the warrant, and asked whether he had any questions. *See* Dkt. 48, Ex. 3 at 3:6-16. She then said, "Okay. You understand you are not under arrest. This is just a search warrant for items, specific items in your home . . . Okay. You understand that?" *Id.* Defendant replied, "Yes." *Id.* Shortly afterwards, SA Eyler reiterated, "Like I said, you're not under arrest." *Id.* at 4:3. The interview lasted for approximately one hour and fifteen minutes. Dkt. 48 at 6. The interview concluded at approximately 12:10 A.M. on March 14. *Id.* at 7. Defendant was not arrested at that time.

Upon a review of the evidence, the pleadings, and the parties' arguments at the March 1 and March 8, 2018 hearing,[3] the Court found that the interview was not custodial, and that *Miranda* warnings were not necessary. The Court therefore denied Defendant's motion to suppress. Several reasons supported the Court's decision, and they are addressed in turn below.

---

[3] Given the unexpected length of the hearing begun on March 1, the Court completed the hearing on March 8.

First, there is absolutely no evidence other than the testimony of Defendant, his wife, and his son to support the claim that the officers executing the search warrant pointed their weapons at Defendant and his family or that any residents of the household were handcuffed. Instead, there is ample evidence to the contrary. Government Exhibit 8, a photo taken by law enforcement during the execution of the search warrant, shows Defendant's family sitting placidly on the living room couch, without handcuffs. This photo is the best evidence of what occurred that day, and it corroborates the law enforcement officers' version of events, not the frankly incredible version related by Defendant, his wife, and his son. For example, Mrs. Stinson's claim that law enforcement officers put herself, her 19 year old daughter, and her 13 year old son in handcuffs (*see* Dkt. 56 at 107:6-7; 108:14-109:18),[4] is improbable at best. Similarly far-fetched is the testimony from Defendant's son that "guns were pointed" at Mrs. Stinson and Defendant's daughter. *See* Dkt. 56 at ; 119:24-120:1.

This is particularly true because the Stinson family testimony is internally inconsistent. For example, Defendant's wife testified that when she answered the door to let the officers in, Defendant was in the basement. Dkt. 56 at 101:25-102:1. Defendant could not recall whether he was in the basement or the dining room. Dkt. 70 at 5:17-20; 6:21-7:1. As another example, despite the testimony of Defendant's son that officers pointed guns at the family, Defendant did not offer consistent testimony about the alleged incident. Initially, he did not recall whether the officers standing by his family were armed, let alone whether they were pointing guns at his wife and daughter. *See* Dkt. 56 at 131:13-21 ("I don't recall if they were armed."); *id.* at 132:8-22 (claiming that a single officer situated in the dining room, not the living room, pointed a gun in the direction of the living room as part of a security sweep). Later, Defendant claimed "at some

---

[4] Defendant's son also testified that he, his mother, and his sister were handcuffed at the outset of the execution of the search warrant. *See* Dkt. 56 at 115:17-18; 119:16.

6

point I saw an officer actually point a gun at her." (*Id.* at 140:14-15). Defendant testified that he saw officers holding his wife and trying to push her, and that he saw his wife say to an officer, "Are you going to shoot me?" *Id.* at 140:17-19. Defendant's wife and son testified to no such interaction. *See id.* at 100-112 (Mrs. Stinson testifying that she argued with officers and was handcuffed, but not that she was pushed or feared being shot); *id.* at 113-115 (Defendant's son testifying that he observed his mother trying to evade restraint, and stating that he did not recall her saying anything at that time).

Unlike the inconsistent stories told by Defendant, his wife, and his son, the testimony of SA Eyler, Det. Abdullah, and SA Stentz was in agreement and supported by photo evidence. SA Eyler testified that she saw no incident in which officers pointed a gun at Defendant's wife or son, nor any incident in which Defendant's family was handcuffed. Dkt. 70 at 45:1-17. She also testified that no officer who was present at the search reported any such incident to her, and that she would have been notified as the lead agent on the case. *Id.* at 45:14-45:22.[5] Det. Abdullah offered similar testimony. He stated that no person was handcuffed during the execution of the search warrant, that no guns were pointed at residents of the house, and that such an occurrence would have been highly unusual during a child exploitation search warrant. *See id.* at 28:13-23. SA Stentz, who was on the entry team and the search team for the warrant, also testified that no member of the Stinson family was forcibly restrained, handcuffed, or had a gun pointed at them. *See id.* at 39:4-40:1.

Having heard and considered the testimony of all the witnesses, the Court finds that the agents came across as honest and experienced, with a reasonable and consistent recollection of

---

[5] SA Eyler also credibly testified that the testimony of Defendant's son (that he observed red and blue lights flashing in his window) was inaccurate because "[w]hen we execute search warrants, our goal is to come in in officer safety, so we don't like to announce our presence at a residence . . . when we do search warrants, there are no lights." *See* Dkt. 70 at 44:7-13.

the facts. The Court can only conclude that Defendant, his wife, and his son concocted their perjurious story to save Defendant from prosecution.

Other factors support the Court's finding that the interview was not custodial. Unlike the defendant in *United States v. Colonna*, Defendant was not awakened by the arrival of the law enforcement officers. *See* 511 F.3d 431, 433 (4th Cir. 2007). Instead, Defendant was awake and alert throughout the search. It even seems that Defendant anticipated the return of the law enforcement officers, as he was found to have begun to run a file deletion program on one of his computers. *See* Dkt. 48 at 11. Also unlike *Colonna*, where 24 officers conducted the search, here at most 13 officers took part in the execution of the search warrant of Defendant's home. *See id.*

The circumstances of this case are also far different from those the Fourth Circuit found custodial in *United States v. Hashime*, where the officers entered the defendant's bedroom with guns drawn, kept the defendant's family outside despite the cold weather, kept defendant barefoot by failing to provide him with socks or shoes, and interviewed him for three hours in a storage area, despite the availability of a finished basement seating area. *See* 734 F.3d 278, 280-81 (4th Cir. 2013). In this case, Defendant was awake and clothed when the officers arrived at his home. *See* Dkt. 56 at 30:7-10.

As Defendant himself acknowledges, SA Eyler informed Defendant that he was not under arrest. Dkt. 43 at 4. ("[SA Eyler] asked whether [Defendant] understood that he was not under arrest . . . She reiterated that [Defendant] was not under arrest."). Defendant was not handcuffed, and although the door of the basement room was shut, it was not locked or otherwise obstructed. Dkt. 48 at 9. The interview was conducted in Defendant's own home, and he was calmly questioned by two law enforcement officers with whom he had previously had consensual and polite interactions. *Id.* at 6, 9. No threats were made. *Id.* at 9. The Court has

reviewed the audio recording of the interview, from which it is clear that the participants maintained a conversational tone throughout. At times, the Defendant answered questions in the negative, showing he was willing and able to do so. *See, e.g.*, Dkt. 48, Ex. 3 at 45:11-16; 46:1-3; *see also* Dkt. 70 at 23:22-24:19. The interview lasted a little over an hour, after which the officers left Defendant's home without arresting him. *See* Dkt. 48 at 10-12.

Under similar circumstances, the Fourth Circuit has found that an interview was not custodial. *See United States v. Nielsen*, 640 F. App'x 224 (4th Cir. 2016). In *Nielson*, as in this case, the defendant was interviewed at his residence rather than at a police station or other law enforcement location. *Id.* at 227. As in this case, the defendant was not handcuffed or otherwise physically restrained, and the interviewing law enforcement officers did not draw their weapons. *See id.* The officers in *Nielson* also told the defendant that he was not in trouble, and for the most part maintained an "empathetic" tone. *Id.* at 227-28. SA Eyler and Det. Abdullah took a similar approach in this case. If anything, the circumstances in *Nielsen* were more extreme than those before this Court: the officers in that case at times engaged in aggressive questioning, and never explicitly told the defendant that he was not under arrest. *See id.* Additionally, the interview lasted for approximately three hours, much longer than the hour and fifteen minute interview in this case. *See id.*

Thus, based on the circumstances as a whole and the facts of this case as compared to precedential case law, the Court concluded that Defendant's freedom was not curtailed to a degree associated with formal arrest. The interview was not custodial, and suppression of Defendant's statements was not warranted.

### III. The *Franks* Hearing & Motion to Suppress Evidence

a. The *Franks* Hearing

In *Franks v. Delaware*, the Supreme Court created a narrow exception to the rule that an accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit. *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011). Under this exception, an accused is entitled to an evidentiary hearing on the veracity of statements in the affidavit if he can make a substantial preliminary showing that false statements were either knowingly or recklessly included in the affidavit *and* that, without those false statements, the affidavit could not support a probable cause finding. *Id.* (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

The *Franks* test also applies when affiants omit material facts with the intent to make, or in reckless disregard of whether they make, the affidavit misleading. *See United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). *Franks* requires more than an allegation of an intentional omission. *Id.* at 301. *Franks* protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the magistrate. *Id.* Thus, mere negligence in recording the facts relevant to a probable cause determination is not enough; to obtain a *Franks* hearing, the defendant must show that the omission is the product of a "deliberate falsehood or of reckless disregard for the truth." *Id.* (citing *Franks*, 438 U.S. at 171). In determining whether an alleged falsity or omission was material to the probable cause determination, the Court must consider whether the inclusion in the affidavit of the deliberately omitted facts would defeat the probable cause showing. *United States v. Tate*, 524 F.3d 449, 456-57 (4th Cir. 2008) ("A 'literally true' affidavit . . . can be intentionally misleading if it deliberately omitted material facts which, when included, would defeat the probable cause showing and thus render false the original 'literally true' affidavit.").

In this case, the state court warrant that authorized the search was premised in part on a one-paragraph statement of probable cause summarizing statements allegedly made by Defendant during an interview earlier that evening. *See* Dkt. 44, Ex. 1. In his motion for a *Franks* hearing and for suppression of evidence, Defendant claimed that the paragraph contained four "materially false and/or exaggerated statements [that were] central to the allegation of probable cause." Dkt. 44 at 4-5.

First, Defendant pointed to the statement in the affidavit that "HSI received information that Dwayne Stinson of Manassas, VA, was paying to watch live video of child pornography in the Philippines from his home in Manassas, VA." *Id.* at 5 (citing Dkt. 44, Ex. 1 at 1). According to Defendant, this statement "substantially exaggerate[d]" what law enforcement actually knew prior to conducting the March 13 interview with Defendant. *Id.* In fact, Defendant claimed, law enforcement did *not* know that Defendant had actually made payments, or what those payments were for. *Id.* Law enforcement knew only that financial accounts associated with Defendant had made payments to accounts associated with the sale of live video child pornography. *Id.*

Second, the affidavit stated that Defendant "was asked if he used an internet pay service named 'xoom' to view pornography in the Philippines, he stated that he did." Dkt. 44 at 6 (citing Dkt. 44, Ex. 1 at 1). Defendant asserted that he never made such an admission, but merely stated that he had paid "girls in the Philippines" to "dance." *Id.* He also claimed to have clarified "but no . . . no sex . . . no child involved in that stuff." *See id.*

Third, the affidavit stated that Defendant was asked "if he communicated with 'marites mier' to make his 'xoom' payments and he stated that he did." Dkt. 44 at 7 (citing Dkt. 44, Ex. 1 at 1). Defendant argued that he had in fact specifically denied recognizing the name 'marites

mier,' and said only that he recognized another name, which the affidavit did not claim was associated with child pornography sales. *See id.*

Finally, the affidavit included a statement that Defendant "stated that the videos that he had watched for over a 2 year period contained under aged girls." Dkt. 44 at 7 (citing Dkt. 44, Ex. 1 at 1). According to Defendant, this was "at the very least a gross exaggeration" of Defendant's actual statement. *Id.* In fact, he said only that he thought some of the girls were underage and that this "could simply have been a reference to a few isolated instances of minors that he saw over two years." *Id.* Defendant argued that the statement was not tied to nudity, sexual activity, or the 2-year period during which Defendant allegedly watched the videos. *See id.*

The Court reviewed the affidavit in support of the search warrant, as well as the audio recording and transcript of the consensual pre-warrant interview conducted on March 13, 2012.[6] While the Court understands the limited scope of the *Franks* exception, and acknowledges that the standard places a heavy burden on the Defendant (*see United States v. Jeffus*, 22 F.3d 554, 558 (4th Cir. 1994)), in this case the Court concluded that a *Franks* hearing was necessary. Defendant made a sufficient showing of the necessity of a *Franks* hearing because he did not merely make allegations, but pointed to specific portions of the affidavit which raised questions about the use of the words chosen in the affidavit vs. recorded interview. The Court was concerned that one of the contested statements was essential to the magistrate judge's finding of probable cause, and that the search warrant would not have been issued in its absence.

In particular, the Court was concerned about the accuracy of the affidavit's statement that Defendant explicitly admitted to watching videos containing under aged girls. The Court also

---

[6] The recording was broken into two parts, but represented a single interview with Defendant conducted before Det. Abdallah sought the search warrant. *See* Dkt. 48, Ex. 1; Ex. 2.

noted that the Government acknowledged that one of the statements in the affidavit "inaccurately identif[ied] the wrong name." *See* Dkt. 49. A review of the recorded interview revealed that Defendant did deny viewing child pornography in one answer at one stage of the interview. *See* Dkt. 48, Ex. 1 at 4:16-18 ("But no, no sexual, no, no child involved in that stuff. I stay away from that stuff.").

Taken as a whole, therefore, the evidence and the parties' pleadings persuaded the Court that the credibility of the agents had been called into question. At minimum, it was clear to the Court that the accuracy of the statements in the affidavit depended at least in part on inferences drawn by the law enforcement officers from Defendant's statements in the March 13 interview. Given this fact, and given the significant role that the evidence sought to be suppressed could play at Defendant's trial, the Court felt it was important to hear from the agents themselves as to how they interpreted Defendant's statements.

b. Suppression of Evidence

For the reasons explained above, the Court believed that a *Franks* hearing was necessary. Therefore a hearing was held and the Court heard testimony from SA Eyler and Det. Abdallah.[7] SA Eyler is a special agent in the Child Exploitation Unit of the Department of Homeland Security ("DHS"). *See* Dkt. 56 at 10:3-7. She has worked at DHS for fifteen years. *Id.* In her role as a special agent in the Child Exploitation Unit, SA Eyler investigates crimes relating to children, Internet, possession, receipt, distribution, production of child pornography, as well as child sex tourism cases. *Id.* at 10:10-13. In the course of her career, she has executed or assisted in the execution of at least 300 search warrants, and has conducted approximately 50 witness interviews. *Id.* at 10:20-11:1. She appeared at the hearing and testified about her background, the

---

[7] At the time of the hearing, Det. Abdallah was a civilian, no longer employed by law enforcement. *See* Dkt. 56 at 94:22-24. For simplicity's sake, the Court refers to the affiant as Det. Abdallah throughout this opinion.

13

pre-warrant discussion with Defendant, the execution of the search warrant, and the interview with Defendant during the execution of the search warrant. *See id.* at 9-71; Dkt. 70 at 43-46.

Det. Abdallah joined the Prince William County Police Department in Virginia after four years of military service, and had approximately ten years of law enforcement experience at the time the search warrant was executed in this case. Dkt. 56 at 82:19-83:10. Det. Abdallah served as an officer with the Virginia State Internet Crimes Against Children ("ICAC") task force and conducted investigations into criminal issues, completed interviews of witnesses and subjects, and routinely presented warrants in connection with those investigations. *Id.* at 83:11-25. Det. Abdallah received training on investigations and interviews of subjects and witnesses both in connection with his military police duties and in connection with his work for the Prince William County Police Department. *Id.* at 84:1-16. In the course of his career, he participated in more than 400 interviews, including more than 100 as an ICAC officer. *Id.* at 85:1-7. He has submitted more than 100 affidavits in support of warrants, none of which have been questioned by a court for credibility. *Id.* at 85:8-14. He appeared at the hearing by telephone and testified about his background, the pre-warrant discussion with Defendant, his application for the search warrant, the execution of the warrant, and the subsequent interview with Defendant. *See* Dkt. 56 at 82-98; Dkt. 70 at 28-36.

At the hearing, SA Eyler and Det. Abdullah testified that the statements in the affidavit were consistent with their recollection of the March 13 interview. *See* Dkt. 56 at 25:11-21 (SA Eyler); 88:9-13 (Det. Abdallah).[8] The agents testified that they recalled Defendant confessing to viewing child pornography, and affirmed that they believed the interview gave rise to probable cause sufficient to seek a search warrant from a magistrate judge. *See id.* at 24:13-22 (SA Eyler); 87:23-88:5 (Det. Abdallah).

---

[8] Both agents acknowledged a single mistake in the affidavit, discussed below.

14

Det. Abdallah also testified that the statement in the affidavit, "He stated that the videos that he had watched for over a 2 year period contained under aged girls," was true according to his understanding. *See id.* at 90:20-92:21. Specifically, he explained that when Defendant said, "I do think some of those girls on there were underage," Det. Abdallah understood Defendant to be referring to child pornography on the website on which Defendant was viewing live transmissions from the Philippines. *See id.* at 87:1-22. Taking this statement in light of the entire interview, Det. Abdallah concluded that Defendant had been viewing child pornography online. *Id.* at 88:1.

When questioned about whether any *other* statements by Defendant supported the affidavit's claim that Defendant had admitted to watching videos for over a two-year period that contained under-aged girls, Det. Abdallah testified that any disconnect between the affidavit and the interview transcript was likely due to a missing portion of the transcript. *See id.* at 91:12-92:21. He did not have any specific recollection of Defendant's statements, which were made more than six years prior to the hearing. *Id.* at 93:6-9. He also acknowledged an error in the affidavit, in which he stated that Defendant had communicated with a "marites mier," when Defendant had actually communicated with a Velma Freddy. *Id.* at 88:14-19. Det. Abdallah testified that the name Velma Freddy was also associated with the sale of live child exploitation material, and that the mistake had been unintentional. *Id.* at 88:20-89:4.

The Court found Det. Abdallah's testimony credible. Throughout the hearing, no evidence arose of any intention by Det. Abdullah to deceive the magistrate judge, nor does the Court perceive a reckless disregard of the truth in the conclusions presented in the affidavit. Det. Abdallah's statements in the affidavit were supported by the recordings, and where they were not, he offered a satisfactory explanation. The affidavit presented Det. Abdallah's reasonable

recollections of Defendant's statements in light of Det. Abdullah's training and experience, including ten years in law enforcement at the time the search warrant was issued (*id.* at 83:7-10) and approximately two years as a Task Force officer with the Virginia State ICAC task force (*id.* at 83:11-16). The inferences Det. Abdallah drew from Defendant's statements were also supported by the assessment of SA Eyler, who had extensive experience as an agent in the Child Exploitation Unit. *See id.* at 10:6-11:1.

Thus, having heard the testimony and the arguments presented by both parties at the hearing, the Court found that there was no evidence that a material false statement was made in the warrant application, or that the affiant officer acted intentionally or in reckless disregard of the truth in presenting the warrant application to the magistrate judge.

For these reasons, and for good cause shown, Defendant's motions (Dkt. 43; Dkt. 44) were **DENIED**.

May 9 2018
Alexandria, Virginia

Liam O'Grady
United States District Judge